# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**BARBARA D. REYNOLDS,**

                  Plaintiff**,**

                                  **Case No. 06-C-292**

      **-vs-**

**LEMAY BUICK-PONTIAC-**
**GMC-CADILLAC, Inc.,**

                  Defendant.

---

# DECISION AND ORDER

---

Barbara Reynolds ("Reynolds") alleges that LeMay Buick-Pontiac-GMC-Cadillac, Inc. ("LeMay"), an automobile dealership in Kenosha, Wisconsin, unlawfully accessed her consumer report in connection with a loan solicitation mailing in violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681. Because the information used to identify Reynolds for the mailing was not a "consumer report" under the FCRA, LeMay's motion is granted and this matter is dismissed in its entirety.

## BACKGROUND

In August 2005, Reynolds received a solicitation mailing regarding an automobile loan. (Complaint at ¶ 6, Exhibit A). The mailer was part of a sales promotion event. LeMay retained the marketing services of Cactus Marketing, Inc. ("Cactus"), a direct marketing company, to create and send a mailer to potential customers who live in a geographical area

near the dealership.[1]  Cactus represented to LeMay that it was a full service direct mail company with over 60 years of automotive advertising experience and that it had created similar mailers for other dealerships nationwide.  LeMay does not have an in-house marketing department or an in-house legal department.

Cactus ordered the list of names and addresses of potential customers from an "emerging from bankruptcy" list that was created and maintained by ClickData, Inc. ("ClickData"). ClickData, through an affiliated company, collected the names and addresses on the bankruptcy list from public records at various bankruptcy courts and sorted it by geographic area.  The bankruptcy list contained only the names and addresses of people who had emerged from bankruptcy and does not contain any consumer level credit-based information that would be found in consumer reports, such as credit scores or payment history.[2]  ClickData created and maintained the bankruptcy list for direct marketing purposes only and its clients are expected to use such a list for the same purposes and not as a factor in establishing eligibility for credit.

The mailer contained, among other things, a solicitation for a pre-approved automobile loan with a credit line of up to $24,970.00.  It also stated that the credit may not be extended if it is determined that the customer "does not continue to meet the criteria used for this pre-approved offer."  (Complaint, Ex. A).  The portion of the mailer that indicates

---

[1]  On March 8, 2007, the Court dismissed LeMay's third-party complaint against Cactus.  (Docket No. 58).

[2]  Cactus had the opportunity to order more detailed information about the individuals on the "emerging from bankruptcy list," including age, marital status, length of residence, estimated household income, gender, presence of children, and whether that person is a "mail order buyer."  (Plaintiff's Proposed Findings of Fact, ¶¶ 3-7,  Docket No. 70). However, Cactus did not request or receive any additional information; only names and addresses were provided. (Defendant's Response to PPFF, ¶¶ 4,5,7, Docket No. 76).

"Information in a pre-qualifying report from a credit reporting agency was used in connection with this offer of credit" is incorrect and was included due to a miscommunication between Cactus and Hi-Tech Printing.

As part of the agreement ("Marketing Promotion Contract") between Cactus and LeMay, LeMay agreed to "insure that the direct mail pieces being used are in full compliance with the laws of their states or the laws of the states they are marketing." (Plaintiff's Proposed Findings of Fact, ¶ 9). However, prior to Cactus sending out the mailer on behalf of LeMay, a copy was sent to LeMay for approval. A representative of LeMay contacted Cactus to determine whether the mailer was in compliance with all state and federal laws and was advised by Cactus that it was. LeMay representatives relied upon this representation and approved the mailer. LeMay did not receive a manifest of the names and addresses of the people that were sent the mailer until after it had been printed and mailed to the potential customers by Cactus' printing company, Hi-Tech Printing.

LeMay did not use the bankruptcy list for the purpose of serving as a factor in establishing Reynolds' eligibility for credit. LeMay only used the bankruptcy list to identify the names and addresses of potential customers to whom mailers should be sent. At LeMay, a customer's credit report would be "pulled" from a credit reporting agency only after the customer sought to use LeMay's financing sources for a vehicle at LeMay and only after the customer completed and signed a credit application. The finance department at LeMay would review the credit application and, together with the employment and residence history of the customer, run a credit check with a credit bureau based on the application. That

-3-

information would be conveyed to the bank for financing. It made no difference whether the customer who entered Lemay had a mailer or not – he or she would be treated in the same manner for purposes of securing financing for an automobile at the dealership.

## ANALYSIS

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## I. Consumer reports under the FCRA

The mere fact that the "emerging from bankruptcy list" contained information about consumers does not subject LeMay's mailing to the FCRA. "[N]ot all reports containing information on a consumer are 'consumer reports.'" *Ippolito v. WNS, Inc.*, 864 F.2d 440, 449 (7th Cir. 1988). Under the FCRA, the term "consumer report" means "any written, oral, or other communication of any information by a *consumer reporting agency*. . . which is *used or expected to be used* or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for credit . . ." 15 U.S.C. § 1681a(d)(1)(emphasis added).

-4-

## II.    Used or expected to be used

Pursuant to the "used or expected to be used" language in the statute, a credit report is a "consumer report" under the FCRA if: (1) the person who requests the report actually uses the report for one of the "consumer purposes" set forth in the FCRA; (2) the consumer reporting agency which prepares the report "expects" the report to be used for one of the "consumer purposes" set forth in the FCRA; or (3) the consumer reporting agency which prepared the report originally collected the information contained in the report expecting it to be used for one of the "consumer purposes" set forth in the FCRA. *See Ippolito*, 864 F.2d at 449.  As relevant here, using such information as a factor in establishing eligibility for credit or insurance is a "consumer purpose."  15 U.S.C. § 1681a(d)(1).[3]

First, LeMay (the end-user who requested the report) did not use the "emerging from bankruptcy list" as a factor in establishing eligibility for credit.  LeMay only used the information as a list of names and addresses of people to whom the mailer would be sent. The information list only listed names and addresses, with the implication that the person was emerging from bankruptcy.  It is undisputed that individuals who brought the mailer to LeMay were not treated any differently than individuals without a mailer.  In other words, with or without a mailer, individuals who attempted to finance the purchase of their car had their credit report pulled only after the credit application was signed and submitted by the applicant.  The mailer made no difference in determining eligibility for credit.

---

[3]  Other consumer purposes include eligibility for employment and those specifically enumerated at 15 U.S.C. § 1681b.

Case 2:06-cv-00292-RTR    Filed 07/30/07    Page 5 of 8    Document 79

Second, the consumer reporting agency that prepared the "emerging from bankruptcy list" (ClickData) did not expect it to be used as a factor in establishing eligibility for credit. Rather, ClickData "created and maintained the bankruptcy list for direct marketing purposes only and its clients are expected to use such a list for the same purposes and not as a factor in establishing eligibility for credit." (Defendant's Proposed Findings of Fact, ¶ 12). This proposed finding of fact is undisputed and dispositive on this issue.[4]

Third, ClickData does not collect its information with the expectation that it will be used as a factor in establishing eligibility for credit. Just like the list created in the instant case, ClickData maintains its own database for direct marketing purposes only.

## III.    Consumer reporting agency

To meet the statutory definition of a "consumer report," the pertinent information also must have been reported by a consumer reporting agency. Under the FCRA, a "consumer reporting agency" is defined as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f). As discussed above, ClickData collects information for marketing purposes only, and Cactus is a printing company which created and distributed the mailers. Therefore, neither qualifies as a consumer reporting agency.

---

[4] Reynolds cites the deposition testimony of a ClickData representative who states that "I don't think ClickData would make any assumptions about how it would be used as far as other than a direct marketing application." (Plaintiff's Response to DPFF, ¶ 12). While ClickData obviously can't predict how its lists are used by the end-user, what matters is ClickData's expectation that the lists are generated for marketing purposes only.

Reynolds argues that ClickData is a "consumer reporting agency" because LexisNexis is the parent corporation of ClickData. It is undisputed that ClickData and LexisNexis are separate corporate entities. (Docket No. 76, LeMay's Response to PPFF, ¶ 15; Sampson Deposition, pp. 22-23). However, Reynolds cites 15 U.S.C. § 1681x, which purports to "prevent a consumer reporting agency from circumventing or evading treatment as a consumer reporting agency . . . by means of corporate reorganization or restructuring, including a merger, acquisition, dissolution, divestiture, or asset sale of a consumer reporting agency . . ." Reynolds provides no evidence demonstrating that LexisNexis and ClickData were involved in a corporate restructuring *with the intended purpose* of evading the FCRA.

Reynolds also cites *Treadway v. Gateway Chevrolet Oldsmobile*, 362 F.3d 971, 982 (7th Cir. 2004), which is confusing because *Treadway* does not speak to the definition of a "consumer reporting agency." *Treadway*'s only resemblance to the instant case is that the defendant was a car dealership. Needless to say, *Treadway* is distinguishable from the case at bar and does not support Reynolds' argument that LeMay received the bankruptcy list from a consumer reporting agency.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1.      LeMay's motion for summary judgment [Docket Nos. 61, 62] is **GRANTED**; and

2.      This matter is **DISMISSED** in its entirety.

Dated at Milwaukee, Wisconsin, this 30th day of July, 2007.

SO ORDERED,


s/ Rudolph T. Randa
**HON. RUDOLPH T. RANDA**
**Chief Judge**